## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## MIDLAND DIVISION

| | |
|---|---|
| **JASON SNIVELY, STEPHEN CLAR, AND ALL OTHERS SIMILARLY SITUATED UNDER 29 USC 216(B),** | |
| *Plaintiffs*, | |
| **v.** | **Civil Action No. 7:15-cv-00134-DC** |
| **PEAK PRESSURE CONTROL, LLC, & NINE ENERGY SERVICES, L.L.C.,** | |
| *Defendants*. | |

## PLAINTIFFS' RESPONSE TO
## NINE'S MOTION FOR DECERTIFICATION

Respectfully submitted,

 /s/ Jack Siegel

**J. DEREK BRAZIEL**
Texas Bar No. 00793380
jdbraziel@l-b-law.com
**TRAVIS GASPER**
Texas Bar No. 24096881
gasper@l-b-law.com
Lee & Braziel, L.L.P.
1801 N. Lamar Street, Suite 325
Dallas, Texas  75202
(214) 749-1400 phone
(214) 749-1010 fax
www.overtimelawyer.com

**JACK SIEGEL**
Texas Bar No. 24070621
jack@siegellawgroup.biz
Siegel Law Group, PLLC
2820 McKinnon, Suite 5009
Dallas, Texas 75201
(214) 706-0834 phone
(469) 339-0204 fax
www.siegellawgroup.biz

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system as of the date file-stamped thereon.

*/s/ Jack Siegel*
**JACK SIEGEL**

## SUMMARY

Peak Pressure and Nine (together, "Nine") move for decertification despite readily conceding Plaintiffs "**generally** performed the same type of work." ECF No. 146, at *25 (emphasis in original).

The decertification inquiry need go no further. After all, "[a] court may deny a plaintiff's right to proceed collectively only if the action arises from circumstances purely personal to the plaintiff, and not from any **generally** applicable rule, policy or practice." *Pedigo v. 3003 S. Lamar, LLP*, 666 F.Supp.2d 693, 698 (W.D. Tex. 2009) (Nowlin, J.) (internal quotation omitted) (brackets in original) (emphasis added).

Nine's entire motion proceeds under the false pretense that FLSA class members at the decertification stage need show that they are identically situated, rather than similarly situated. *E.g.*, *Metcalfe v. Revention, Inc.*, 2012 WL 3930319, at *5 (S.D. Tex. Sept. 10, 2012) ("Courts have repeatedly stressed that Plaintiffs must only be similarly—not identically—situated to proceed collectively."). And **"similarly situated" is the recognized standard for collective action certification** because, of course, "Rare would be the collective action … where the employees labored under the exact same circumstances. Indeed, '[i]f one zooms in close enough on anything, differences will abound.'" *Thompson v. Bruister and Assocs., Inc.*, 967 F.Supp.2d 1204, 1220 (M.D. Tenn. 2013) (quoting *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-cv-1018 (PJS/RLE), 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007)) (brackets in original); *see also Rousell v. Brinker Intern., Inc.*, 441 Fed.Appx. 222, 226-27 (5th Cir. 2011) ("'[FLSA] Plaintiffs' claims need to be considered at a higher level of abstraction.' [D]istinctions must make a difference relevant to the legal issues presented." (quoting *Frank*, 2007 WL 2780504, at *4)).

The idea that all class members must be identically situated is as incorrect as Nine's misleading claim in its opening that the Supreme Court's recent case in *Encino Motorcars, LLC v.*

*Navarro*,[1] held that courts must "fairly interpret the FLSA,"[2] when the Court was referring specifically to the "fair" application of FLSA exemptions and not its collective action mechanism or any other element of the Act. *See Rodriguez v. Adams Rest. Gp.*, No. 16-cv-0977 (DLF), 2018 WL 1936001, at *4 n.1, --- F.3d ---- (D.D.C. Apr. 23, 2018); *Friedman v. Nat'l Indem. Co.*, No. No. 8:16-cv-258, 2018 WL 1954218, at *2 (D. Neb. Apr. 13, 2018).

Under the proper standard, Plaintiffs have met their burden to show that they are similarly situated. "[T]hey suffer from a single, FLSA-violating policy …." *O'Brien v. Ed Donnelly Enterps., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009), *abrogated on different grounds by Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016). "[A]nd … proof of that policy or conduct in conformity with that policy [will] prove[ ] a violation as to all the plaintiffs." *Id.*

The Court should reject Nine's invitation to create a new (and long-rejected) standard of "identicality" and deny its motion for decertification.

## FACTUAL BACKGROUND

### A.  ALL PCOS SHARE SUBSTANTIALLY THE SAME PRIMARY JOB DUTIES.

The job duties and responsibilities of PCOs are substantially the same. PCOs' primary job duties consist of traveling to Nine's customers' jobsites and setting up, operating, and maintaining pressure control equipment used to provide its services to customers. The consistent testimony of at least 15 PCOs confirm all Plaintiffs performed predominantly non-exempt, routine manual labor to provide Nine's services and equipment to its customers at well sites.

### B.  ALL PCOS PREPARE, REPAIR & LOAD EQUIPMENT AT THE SHOP PRIOR TO TRAVELING TO THE WELLSITE.

---

[1] 138 S.Ct. 1134, 1142 (2018).

[2] ECF No. 146, at *1.

PCOs are dispatched from Nine's shop where they receive information regarding their job assignments, equipment they needed for their job assignments, and other job specifics. Ex. A, District Manager Jeff Tranum Depo. at p. 62; Ex. C, Operator Uriel Sanchez Depo. at pp. 160-161, 172; Ex. D, Operator Carlos Rivera Depo. at pp. 63-64; Ex. G, Operator Jason Snively Depo. at p. 100. PCOs would typically receive this information at the shop from Nine's Assistant Managers or a third-party wireline engineer after finding out who was working on the job. Id. PCOs also report to the shop to perform maintenance on equipment and tools, and to load and secure the equipment and tools into trucks prior to heading to the jobsite. Ex. F, Operator Stephen Clark Depo. at p. 40; Ex. A, District Manager Jeff Tranum Depo. at 101-02. PCOs perform routine maintenance and labor prior to heading out to a jobsite with their loaded trucks, such as:

- Washing trucks, equipment and tools;[3]
- Opening up equipment to check for leaks or if other repairs needed to be made;[4]
- Filling up units with fluids, diesel and grease;[5]
- Replacing valves check valves and dump valves;[6]
- Pulling and breaking apart hoses (Id. at 88-89);[7]
- Loading the equipment and tools into the truck;[8] and
- Securing the equipment and tools in the truck with straps/chains.[9]

Nine's shop manager oversees this process and that overseeing shop manager is the Nine employee ultimately responsible for ensuring that the equipment is inspected and in proper working condition

---

[3] Ex. B, Operator Jose Samano Depo. at p. 87.

[4] *Id*. at 88-89.

[5] *Id*. at 87-89.

[6] *Id*. at 88-89.

[7] *Id*.

[8] *Id*. at 87.

[9] *Id*.; *see also* Ex. A, District Manager Jeff Tranum Depo. at pp. 148, 153-55 (discussing preparatory and maintenance work done by Operators); Ex. F, Operator Stephen Clark Depo. at pp. 42-43 (same).

before going to the jobsite. *Id.* at 87; Ex. C, Operator Uriel Sanchez Depo. at 172:16-23.

After loading the truck and conducting a pre-trip inspection (checking the oil, water, transmission fluid, and tire pressure), PCOs drove Nine's trucks to the wellsite. Ex. A, at 155; Ex. D, Operator Carlos Rivera Depo. at pp. 73, 85-86; Ex. B, Operator Jose Samano Depo. at p. at pp. 91-92; *Id.* at 58:9-21. The preparatory work done at the shop could take anywhere from three hours to a full day depending on the condition of the equipment and tools. Ex. G, Operator Jason Snively Depo. at pp. 236-37; Ex. B, Operator Jose Samano Depo. at pp. 189-90.

## C.  ALL PCOs SPEND MOST WORK TIME OUTSIDE PERFORMING MANUAL LABOR.

Performing the job duties of an PCO does not require an advanced degree or a high degree of advanced knowledge. Some PCOs had only a high school diploma. Ex. F, Operator Stephen Clark Depo. at p. 14-15 (confirming he has no college degree); Ex. D, Operator Carlos Rivera Depo. at 25:9-11 (same).  PCOs don't need any advanced education because they primarily perform manual/technical labor. Their duties are labor-intensive, and the equipment they work with is heavy and burdensome:

> The equipment that we used weighed approximately 30,000 pounds, so, you know, 15 tons of iron you have to rig up by yourself, with a crane operator. That was probably the most difficult part. All the hoses and lines related to the job, you're dragging around a couple hundred feet of hoses to get your job ready, and then you take -- you know, you tear it all down when you rig down, and, of course, you've got the actual job where you're taking the lubricator off and on the well and everything else involved.[10]

Because of the dangerous conditions at well sites,[11] PCOs performed their job duties in company-provided hardhats, safety glasses, boots, harnesses, H2S monitors, and fire-resistant coveralls

---

[10] Ex. H, Operator William Carter Depo. at p. 17.

[11] Ex. B, Operator Jose Samano Depo. at p. 96:16-18; Ex. G, Operator Jason Snively Depo. at p. 151; Ex. H, Operator William Carter Depo. at p. 21.

when on the job.[12] OSHA requires PCOs to wear impact gloves.[13]

**D.  ALL PCOS PERFORM THE LABOR-INTENSIVE RIG UP PROCESS.**

All PCOs are responsible for rigging up and rigging down Nine's equipment and tools at jobsites.[14] Rigging up involves the PCO (1) unstrapping and unchaining all of the equipment;[15] (2) putting a lifting cap or night cap on the flange;[16] (3) getting into man lift with a harness and lanyard to use a hammer wrench to tighten a flange, typically weighing between 190 and 375 pounds,[17] onto the well head (a process that takes about 30 to 45 minutes);[18] (4) laying the lubricator down and guiding it into the crain; (5) providing the wireline unit with his grease head; (6) dragging around and connecting a couple of hundred feet of hoses to get them in place;[19] and (7) putting a night cap onto the well that would remain there until the first wireline jobs.[20] In some rig ups, PCOs would have to tighten "stinger flanges" using a 10-pound sledge hammer on a man lift to ensure they fit tight on the wellhead. *Id.* at 72-74. The rig up process can take from one hour to one-and-a-half hours with approximately half that time spent on setting up the flange and the other half getting everything laid out and ready to go. *Id.* at pp. 71-81, 247.

---

[12] Ex. C, Operator Uriel Sanchez Depo. at pp. 64-65; Ex. G, Operator Jason Snively Depo. at p. 65.

[13] Ex. A, District Manager Jeff Tranum Depo.  at p. 164.

[14] Ex. I, Bruce Morgan Corp. Rep. Depo. at p. 99.

[15] Ex. A, District Manager Jeff Tranum Depo.  at p. 245.

[16] *Id.* at pp. 245-46.

[17] Ex. E, Eddie Merriman Corp. Rep. Depo. at 122-123.

[18] Ex. A, District Manager Jeff Tranum Depo. at pp. 157, 247; Ex. B, Operator Jose Samano Depo. at 102:2-10.

[19] Ex. H, Operator William Carter Depo. at pp. 17, 25.

[20] Ex. C, Operator Uriel Sanchez Depo. at p. 77.

**E.  ALL PCOS SUPPORT WIRELINE OPERATIONS.**

The PCOs provide support during wireline runs on the wellsite. For this part of their jobs, the PCOs have to put on a safety harness, get in a man lift, and take off the night cap before each wireline run and put it back on after each wireline run before the next fracking stage begins. Ex. B, Operator Uriel Sanchez Depo. at 77:15-25. Once all stages are completed, the PCO rigs down and takes the truck back to the shop. *Id.*

**F.  ALL PCOS HAD THE SAME QUALIFICATIONS BASED ON THE SAME JOB DESCRIPTION (THE ONE NINE WITHHELD FROM PLAINTIFFS DURING DISCOVERY)**

The requirements to work as a PCO are uniform, as confirmed by Nine's single job description:

- High school diploma or equivalent;

- Current NCCCO Crane and pressure control certification, or ability to obtain certifications within 120 days;

- Class A Commercial Driver's license or ability to get one within 120 days;

- Willingness to work outside in environmental conditions at dangerous worksites involving risk of electrical shock; exposure to fumes or airborne particles; and exposure to toxic or caustic chemicals.

- Ability to frequently lift objects that weigh 50 pounds and occasionally lift over 150 pounds or more; frequently climb or balance and stoop, kneel, crouch or crawl; climb up and down ladders; work on slippery uneven circumstances; complete a Physical Capacity Test.[21]

So PCOs' job duties are not only uniform, but also dependent on the physical ability to perform manual labor, including lifting heavy objects, outside in dangerous working conditions. All PCOs perform the same manual labor outside of an office environment.

---

[21] https://nineenergyservice.com/careers/careers-in-the-us (last visited May 25, 2018) (providing that "Pressure Control Operator is primarily responsible for work directly related to the use and maintenance of Pressure Control Equipment of the Company.").

### G.  ALL PCOs WORKED SIMILAR HOURS & DID NOT RECEIVE OVERTIME

Aside from rigging up and rigging down, PCOs spent the majority of their day outside physically walking equipment on the wellsite, monitoring gauges, using tolls such as sledge hammers and hammer wrenches; tightening bolts and rings; cleaning, repairing, and replacing equipment; fueling up units; fixing leaks; and performing work in a harness on a man lift to climb onto units to facilitate wireline operations. Ex. B, Operator Jose Samano Depo. at pp. 88-89, 95, 138, 169-170; Ex. C, Operator Uriel Sanchez Depo. at pp. 65, 74-75, 80-81, 226-27; Ex. D, Operator Carlos Rivera Depo. at pp. 112-115, 120, 127, 132-33, 150; Ex. F, Operator Stephen Clark Depo. at pp. 40, 43, 50, 52-53, 85, 87-88; Ex. G, Operator Jason Snively Depo. at pp. 93, 156, 161-64, 229; Ex. H, Operator William Carter Depo. at pp. 22-23, 51, 80-81, 95.  PCOs did not use highly elevated thinking or exercise of discretion. Ex. G, Operator Jason Snively Depo. at p. 172; *Ex. B*, Operator Jose Samano Depo. at 103:7-11. Rather, multiple Operators reported that the most challenging part of their job was dealing with the long hours and lack of sleep caused by often working 7-days or over 120 hours a week. Ex. C, Operator Uriel Sanchez Depo. at pp. at 181-82 (confirming that he averaged at least 120 hours per week during employment); Ex. D, Operator Carlos Rivera Depo. at 59:25-60:3; Ex. F, Operator Stephen Clark Depo. at p. 63-66; Ex. G, Operator Jason Snively Depo. at p. 202-03; *see also* ECF 33 at Exhibit C-T.

### DECERTIFICATION STANDARD

The Fair Labor Standards Act does not define "similarly situated." However, the Fifth Circuit has endorsed the analysis for decertification utilized by most district courts in determining whether plaintiffs are similarly situated: "'(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.'" *Roussel v. Brinker Intern., Inc.*, 441 Fed. Appx. 222, 226 (5th Cir. 2011) (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207,

1216 (5th Cir. 1995)). "The three factors are not mutually exclusive and there is considerable overlap among them." *Maynor v. Dow Chem. Co.*, 671 F.Supp.2d 902, 930-31 (S.D. Tex. 2009) (quotation omitted); *Plewinski v. Luby's Inc.*, C.A. No. H-07-3529, 2010 WL 1610121, at *2 (S.D. Tex. Apr. 21, 2010) (same).

At decertification, Plaintiffs need show only that the opt-in plaintiffs are similarly situated to the lead plaintiffs. *Id.* "Though heightened at the decertification stage, the 'similarly situated' requirement [under the FLSA] is considerably less stringent than the commonality requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure." *White v. NTC Transp., Inc.*, No. 4:11-cv-007-SA-JMV, 2013 WL 5874566, at *2 (N.D. Miss. Oct. 31, 2013). And district courts have been "fault[ed] … for implicitly applying Rule 23's predominance standard." *Frye v. Baptist Mem. Hosp., Inc.*, 495 Fed.Appx. 669, 672 (6th Cir. 2012) (citing *O'Brien*, 575 F.3d at 584).

Plaintiffs can demonstrate "similarly situated" circumstances by showing a common theory of FLSA violation. *O'Brien*, 575 F.3d. at 585 (noting, however, that the FLSA did not necessarily require such a common theory). Plaintiffs need only establish that "a factual nexus [ ] binds [plaintiffs] together as victims of an alleged policy or practice" for courts to conclude that they are similarly situated. *Thiebes v. Wal-Mart Stores, Inc.*, CIV. 98-802-KI, 1999 WL 1081357, at *2 (D. Or. Dec. 1, 1999); *Falcon v. Starbucks Corp.*, 580 F.Supp.2d 528, 535 (S.D. Tex. 2008). This factual nexus may be shown where: (1) the plaintiffs' employer engaged in a unified policy, plan or scheme of FLSA violations, or (2) named plaintiffs' positions are otherwise "similar, not identical, to the positions held by other class members." *Kautsch v. Premier Comm's*, No. 06-cv-04035-NKL, 2008 WL 294271, at *1 (W.D. Mo. Jan. 31, 2008) (citing *Grayson v. K-Mart Cop.*,

79 F.3d 1086, 1096 (11th Cir. 1996); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001)).

The court does not evaluate the merits of plaintiffs' claims at the decertification stage. *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78, 83 (D. Conn. 2009) ("Notably, even at the second step of the certification stage, courts do not address the merits of the plaintiffs' claims. Such an inquiry is irrelevant at the certification stage, as long as plaintiffs assert a plausible basis for their claims."); *Gardner v. W. Beef Properties, Inc.*, 07-CV-2345 NGG JMA, 2013 WL 1629299, at *3 (E.D.N.Y. Mar. 25, 2013) *adopted sub nom. White v. W. Beef Properties, Inc.*, 07 CV 2345 RJD JMA, 2013 WL 1632657 (E.D.N.Y. Apr. 16, 2013)) (same). Similarly, the Court does not address the merits of the defendant's defenses, but rather looks only to "whether the defenses asserted will be so individualized as to merit decertification." *Cottle v. Falcon Holdings Mgmt., LLC*, 892 F.Supp.2d 1053, 1069 (N.D. Ind. 2012).

Irrespective of how the factors are considered, they should be balanced with the fundamental purpose of the FLSA's collective action mechanism, which is to lower costs through the pooling of resources and to limit the controversy to one proceeding to efficiently resolve common issues of law and fact that arose from the same alleged illegal activity—that is, the failure to pay overtime. *See Maynor v. Dow Chem. Co.*, 671 F.Supp.2d 902, 935-36 (S.D. Tex. 2009) (Rosenthal, J.) (denying decertification after balancing alleged individual issues regarding liability and damages with the efficiency of trying common issues together).

Ultimately, "The decision whether to decertify a collective action is within the district court's discretion." *Falcon v. Starbucks Corp.*, 580 F.Supp.2d 528, 534 (S.D. Tex. 2008) (citing *Mooney*, 54 F.3d at 1213; *Pendlebury v. Starbucks Coffee Co.*, 518 F.Supp.2d 1345, 1348-49 (S.D. Fla. 2007) (same).

## ARGUMENT

### A. Plaintiffs Share Similar Job Duties & Pay

Nine's motion is primarily focused on exaggerating or inventing supposed differences in Plaintiffs' employment. But these alleged differences do not ultimately impact the (relatively straightforward) issues to be decided in this case: whether Nine paid its operators on XXX basis, and if so, whether it was excused from paying them overtime because they were exempt under the Motor Carrier Act or the highly compensated exemption.

Nine points to infinitesimal differences in PCO's job duties to try to claim that members of the class are not similarly situated. A simple review of the consistent testimony and evidence about Plaintiffs' job duties and pay shows that Nine is trying to hold Plaintiffs to too high a standard—essentially that all PCOs must work under the exact same conditions and circumstances for the exact same hours each week. If this were the standard, no FLSA case would ever survive decertification. Instead, the members of the class need only be similarly situated *E.g.*, *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009); *Thompson*, 967 F.Supp.2d at 1220. Courts recognize that "[i]f one zooms in close enough on anything, differences will abound ... But plaintiffs' claims need to be considered at a higher level of abstraction." *Frank v. Gold'n Plump Poultry, Inc.*, No. 04-cv-1018 (PJS/RLE), 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007); *see also Butler v. DirectSAT USA, LLC*, 47 F.Supp.3d 300, 311 (D. Md. 2014) ("A collective action does not necessitate that there be do differences among class members[.]"); *Thompson v. Bruister & Assocs.*, Inc., 967 F.Supp.2d 1204, 1220 (M.D. Tenn. 2013) ("Rare would be the collective action—or class action for that matter—where the employees labored under the exact same circumstances."); *Khadera v. ABM Indus. Inc.*, No. C08-0417 RSM, 2011 WL

7064235, at *3 (W.D. Wash. Dec. 1, 2011) ("Although distinctions certainly exist between the specific type and manner of cleaning performed by the various Opt-In Plaintiffs, Defendants exaggerate those distinctions.").

**B.  Nine's MCA Argument Boils Down to Damages**

Nine's principle decertification argument is that the Court should completely ignore the similarity in Plaintiffs' job duties and compensation and should instead focus solely on its contention that individualized testimony will be required to determine the damages suffered by each Plaintiff and Opt-In, because each Plaintiff will have to testify regarding each week they worked in order to address the MCA exemption and TCA exception.

Nine's underlying premises are totally incorrect.

As a starting point, "A collective action does not … prohibit individualized inquiry in connection with fashioning the specific relief or damages to be awarded to each class member." *LaFleur v. Dollar Tree Stores, Inc.*, 30 F.Supp.3d 463, 474 (E.D. Va. 2014) (internal quotations omitted); *see also Maynor v. Dow Chem. Co.*, 671 F.Supp.2d 902, 934–35 (S.D. Tex. 2009) ("The need for individual plaintiffs to establish the amount of uncompensated time does not defeat certification.").

This case is no different than any other FLSA collective action, where the jury would decide whether certain exemptions apply. At that point, in class/collective overtime wage suits, it is well settled that back pay may be awarded to non-testifying claimants on the basis of evidence adduced from a "fairly representational" subset. *Donovan v. Bel-Loc Diner. Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985). This rule is derived from the standard of proof set forth in *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680 (1945) which allows proof of overtime hours "as a matter of just and reasonable inference," a standard which may be met in the context of a group action by

establishing a "pattern or practice" of overtime work by class members. *Donovan*, 780 F.2d at 1116; *see also, Martin v. Selker*, 949 F.2d 1286, 1298 (3rd Cir. 1991) ("It is not necessary for every single affected employee to testify in order to prove violations or to recoup back wages. The testimony of representative employees may establish prima facie proof of a pattern and practice of FLSA violations" citing to four other cases where representative testimony was used).

This case can easily be presented to the jury to decide issues of classwide applicability— that is, Nine's liability and whether Plaintiffs' qualify for any exemptions (highly compensated or MCA), or would qualify under the TCA exclusion to the MCA exemption. At that point, the application of the jury's exemption and exclusion decisions becomes a routine exercise that the jury can easily apply to the class members—and a routine exercise that is most fairly exercised by one jury uniformly applying its decisions to all class members. *See Andrako v. U.S. Steel Corp.*, 788 F.Supp.2d 372, 381 (W.D. Pa. 2011) ("Here, many of the differences to which Defendant points go to individual damages, not liability across the entire class. It is well-established that [t]he fact that individualized findings regarding damages may be necessary does not require class decertification."); *see also Maynor*, 671 F.Supp.2d at 934-35 (collecting cases).

Although the Fifth Circuit's decision in *Carley v. Crest Pumping Technologies, L.L.C.* may have shifted the TCA burden back onto Plaintiffs, it also simplified the standard of proof by making clear that the standard for vehicle weight under the MCA / TCA is GVWR, which is determined by the manufacturer at the time of production, rather than being dependent on the vehicle's load, towage, or other vehicle characteristic for which the driver's testimony is necessary. No. 17-50226, 2018 WL 2246178, at *6, --- F.3d ---- (5th Cir. May 16, 2018). All that should be needed to determine GVWR are Nine's fleet and driver records.

Worse still, to push this argument, Nine would be taking advantage of its own failure to comply with its record-keeping requirements under the MCA and the FLSA (or its refusal to produce relevant documents in discovery). Had Nine complied with its legal obligations and maintained a record of the hours actually worked by its employees, determination of damages would be little more than a mathematical exercise based upon Nine's fleet, time, and payroll records.

### C. Nine's cases were all decertified for reasons divorced from the MCA

Nine tries to bolster its decertification argument by pointing to three selected cases decertifying cases where the MCA was involved.

Nine's citation to *Vanzzini v. Action Meat Distributors, Inc.*, is misleading at best. 995 F.Supp.2d 703 (S.D. Tex. 2014). *Vanzzini* did not involve a common job title, as Plaintiffs here. Instead, there was a sole plaintiff, Flanagan, who was allegedly subject to the MCA. "Mr. Flanagan… [was not] similarly situated to anyone else in the class[.] [His] work duties diverged widely … from … those of the pullers. Mr. Flanagan was a driver." *Id.* at 722. Not only did Flanagan's job duties differ from the pullers, but he did not work in the same location, have the same training, work the same hours, or get paid in the same manner. *Id.* at 723. He didn't even seek relief under the same claims. *Id.*

Decertification in *Peña v. Handy Wash, Inc.* had as much or more to do with the plaintiffs' disputed independent contractor status as it did with the MCA. No. 14-cv-20352, 2015 WL 11713032 (S.D. Fla. May 22, 2015). That's because, "At the heart of th[at] misclassification case is the economic realities test, a 'fact intensive' test requiring 'individualized analysis … to determine whether each driver is an independent contractor or an employee for FLSA purposes." *Id.* at *10 (quoting *Demauro v. Limo, Inc.*, No. 8:10-cv-413-T-33AEP, 2011 WL 9191, at *3 (M.D.

Fla. Jan. 3, 2011)) (ellipsis in original). Although the MCA may have been a factor in the court's decertification decision, the court was primarily concerned with "the nature of the economic realities test and the identified factual distinctions between the Plaintiffs" related to their independent contractor status, "for example, the discretion and control each Plaintiff exercised over the manner in which he or she performed the work, each Plaintiff's respective investment in work equipment, and each Plaintiff's historical work relationship with Defendants as either a contract ticket driver, hourly employee driver, or both." *Id.*

And although the Southern District of Florida may have decertified an MCA case in Nine's only actually relevant case, *Rojas v. Garda CL Southeast, Inc.*,[22] this unreported case carries less weight than reported ones refusing decertification and no more weight than other cases denying decertification. *See Wilkinson v. High Plains Inc.*, No. 1:16-cv-011, 2018 WL 1123863, at \*7, 297 F.Supp.3d 988 (D.N.D. Mar. 1, 2018) ("In making their [decertification] argument [on the MCA exemption], the Defendants focus on the amount of time individual Plaintiffs spent working on large vehicles and contend that work was more than de minimis and requires an individualized analysis. As the Court has explained, the Defendants' focus on large vehicle work is misplaced. Since it is undisputed the Plaintiffs worked on a 'mixed fleet' and 'there is nothing in the language or structure of the statute indicating that Congress intended to limit the reach of the TCA to exclude employees working on mixed fleets of vehicles,' there is no reason to decertify the class.") (quoting *Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 602 (4th Cir. 2017)); *see also Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 3:12-cv-00596-MOC-DSC, 2015 WL 1346125 (W.D.N.C. Mar. 24, 2015) (entering determination (prior to finding FLSA coverage) that MCA exemption analysis did not "overwhelm the 'similarly situated' analysis" to merit decertification).

---

[22] No. 13-cv-23173, 2015 WL 5084135 (S.D. Fla. Aug. 28, 2015).

### D.  Nine's Defenses are Collective—Not Individualized—in Nature

"Though [Nine] will not admit it, [Nine] has already conceded the most fact-intensive liability defenses it has in this lawsuit—the [Motor Carrier Act] exemption and the [highly compensated] exemption—can be decided as a matter of law **despite** the differences [Nine] identifies in its decertification motion." *Clark v. Centene Co. of Texas, L.P.*, 44 F.Supp.3d 674, 689 (W.D. Tex. 2014) *aff'd,* 656 Fed.Appx. 688 (5th Cir. 2016) (Sparks, J.) (emphasis in original). Although Nine did not file a class-wide motion for summary judgment, its so-called "individualized" motions for summary judgment on Carter [ECF No. 143], Rivera [ECF No. 144], and Sanchez [145] are name-changer motions which Nine has—solely because of the still-pending decertification—opted to file individually.

Nine's own motion for decertification does little to disguise the games it is playing with its class-wide MCA defense: "If these workweeks are representative of all workweeks for all Plaintiffs, then Defendants should be entitled to summary judgment on all claims for all Plaintiffs for all workweeks." ECF No. 146, at *4; *see also id.* at *4 n.1 ("Defendants maintain that there are numerous other workweeks of numerous other Plaintiffs for which there is similar evidence.").

Nine argues in decertification that all Plaintiffs are dissimilar enough to split this case into 70 separate lawsuits, yet simultaneously says that it is plotting to file 67 more, identical motions for summary judgment. "These positions are wholly inconsistent, and substantially undercut the force of [Nine]'s decertification argument." *Clark*, 44 F.Supp.3d at 689; *see also Monroe v. FTS USA, LLC*, 763 F.Supp.2d 979, 985 n.6 ("Defendants' motion for summary judgment is in tension with their motion to decertify since one seeks to conclude the case on a classwide basis while the other argues that classwide adjudication is improper."); *Spoerle v. Kraft Foods Global, Inc.*, 253 F.R.D. 434, 439 (W.D. Wisc. 2008) ("[I]t is somewhat ironic that defendant is now arguing that it

- 15 -

is impossible to determine liability on a class wide basis. After all, it was defendant that moved for summary judgment … arguing that it was possible to resolve the entire case as a matter of law without regard to the differences between the plaintiffs.").

Nine's exemption defenses are all subject to class-wide resolution, even if Nine has (purposefully) chosen not to seek it. Exemption defenses do not require individual analysis and instead may be determined collectively. *See*, *e.g.*, *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008) (affirming district court's denial of decertification in an executive exemption case where evidence showed plaintiffs were similar in day-to-day responsibilities and particular non-exempt duties); *Ruffin v. Avis Budget Car Rental*, LLC, 2014 WL 294675, at * (D.N.J. Jan. 27, 2014) (concluding, where plaintiffs in executive exemption case performed substantially similar duties and nearly all had the same position, variations regarding certain aspects of job duties were immaterial differences);   *Simmons v. Valspar Corp.*, 2013 WL2147862, at *1 (D. Minn. May 16, 2003) (denying decertification in case involving territory managers who alleged they were misclassified as administrative and outside sales exempt employees); *Morrison*, 290 F.R.D. 347, 359 (D. Conn. 2013) (refusing to decertify executive exemption cases involving assistant store managers); *Nerland v. Caribou Coffee Co., Inc.*, 564 F.Supp.2d 1010, 1025 (D. Minn. 2007) (concluding evidence regarding store managers' employment precluded decertification in an executive exemption case).

Courts have denied decertification in misclassification cases like this one, in part, because of the employer's uniform classification decision that failed to consider each employee's individual circumstances. *See*, *e.g.*, *Clark*, 44 F.Supp.3d at 690 (refuting employer's claim that there was individualized exemption defenses where employer made its exemption classification decisions on a position-wide basis); *Morrison v. Ocean State Jobbers*, 290 F.R.D. 347, 359 (D.

- 16 -

Conn. 2013) (finding defendant's decision to blanketly classify the job position as exempt is relevant to deciding whether plaintiffs were similar in relevant ways regarding the exemption); *Pendlebury v. Starbucks Coffee Co.*, 518 F.Supp.2d 1345, 1352-53 (S.D. Fla. 2007) (finding the employer's decision to classify all store managers as exempt based on the "job itself," without an individualized finding, was relevant to the plaintiffs' similarly situated status).

Similarly, here, Nine's decision to continue classifying all operators as exempt from the FLSA considered none of the differences it now argues compel decertification. Nine did not consider: (1) whether Plaintiffs performed any "safety-affecting activities"; (2) the types and weights of vehicles that Plaintiffs drove; (3) whether Plaintiffs towed a trailer; (4) the "purpose" or "work" for each Plaintiff to use a vehicle; or anything else that Nine claims is relevant now that it is in litigation. *See* ECF No. 146, at *14. Nine instead make a classification decision for all operators based on a single job description. Nine's omnibus classification of operators as exempt, regardless of any "differences" it decided to exaggerate in this lawsuit, shows that Plaintiffs actual job and pay were in fact sufficiently similarly situated. *See Morrison*, 290 F.R.D. at 361 (concluding defendant's perception of plaintiffs' job as being sufficiently similar to support a single exemption determination is probative of actual similarity among plaintiffs). Such an attempt to distinguish class members post-litigation can be dismissed out of hand for what it is. *See Nerland*, 564 F.Supp.2d at 1024 ("The Court finds it disingenuous for [Defendant], on one hand to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming that plaintiffs cannot proceed collectively to challenge the exemption.").

- 17 -

**E. Considerations of Fairness and Manageability Support Collective Determination**

The FLSA's remedial purpose and judicial efficiency, fairness, and procedural considerations weigh heavily in favor of Plaintiffs proceeding collectively. Courts should also be mindful that the primary objectives of FLSA collective actions are (1) to help lower the costs to plaintiffs through the pooling of resources and (2) to benefit the judicial system by efficient resolution in one proceeding of common issues of law and fact. *Escobedo v. Dynasty Insulation, Inc.*, No. EP-08-cv-137-KC, 2009 WL 23892982, at *4 (W.D. Tex. Jul. 31, 2009) (Cardone, J.) (citing *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). Courts must balance these benefits with any potential detriment to the defendant and the potential for judicial inefficiency as a result of collective treatment. *Id.* As this District has previously observed:

> Proceeding collectively always poses certain logistical challenges, and this case is no different in that regard. But the alternative—more than two dozen individual trials litigating largely the same liability issues and defenses—is less efficient, less expedient, and simply unnecessary.

*Clark v. Centene Co. of Texas, L.P.*, 44 F. Supp. 3d 674, 691 (W.D. Tex. 2014) (Sparks, J.), *aff'd*, 656 F. App'x 688 (5th Cir. 2016)

Here, Plaintiffs have met their burden and demonstrated they are similarly situated in order to benefit from the advantages of an FLSA collective action. And just as important, Nine offers no tenable solution. The only alternative to this collective action that Nine advances is to have 70 (virtually identical) cases instead of this one. If decertification were granted, the federal court system potentially would have 70 or more individual lawsuits all dealing with the same issue. Notably, because most or all Plaintiffs worked for Nine in this District and Division, the majority— if not all—of those cases will just end up right back in front of this Court:

> If Defendant's [decertification] Motion was granted, Opt-In Plaintiffs would be dismissed without prejudice. They would then be free to re-file their claims— perhaps individually, perhaps as a separate class[.] In that case, the Court would face the possibility of several lawsuits relating to a single Defendant's overtime

compensation policies …. To state the obvious, the Court does not find this to be efficient[.]

*Escobedo*, 2009 WL 23892982, at *9; *see also Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 362 ("Litigating overtime claims for each of these [25] plaintiffs individually would be burdensome on those plaintiffs, the defendant, and the courts."); *Monroe v. FTS USA, LLC*, 276 F.Supp.2d 979, 996 (W.D. Tenn. 2011); ("The investment of time and resources required for [individual] trials would render adjudication of Plaintiffs' claims so unwieldy and expensive as to substantially hinder, if not preclude, their resolution by judicial means. Such a result is incompatible with the goals of FLSA collective actions, which include facilitating trial of claims that otherwise would be too cost-prohibitive to warrant independent litigation."); *Kauthsch v. Premier Comms.*, No. 06-cv-04035-NKL, 2008 WL 294271, at *4 (W.D. Mo. Jan. 31, 2008) ("[S]eparate trials is the worst possible outcome in terms of efficiency."). There is simply no tenable argument that presents a more manageable solution for the federal courts, much less this Court, than dealing with the simple and discrete issues of week-by-week exemptions or exceptions.

For the same reasons, Nine has not shown that the Court cannot manage the trial in "a manner that will not prejudice any party or be particularly burdensome to a jury." *Reyes v Texas Ezpawn, L.P.*, C.A. No. V-03-128, 2007 WL 101808, at *6 (S.D. Tex. 2007) (citing *Thiessen,* 267 F. 3d at 1105). The opposite is, in fact, true.

Nine's foreboding vision of trial as something like the apocalypse is belied by the fact that class and collective action cases much larger and more complex than this are tried routinely. For example, in *Donovan v. Burger King*, representative evidence of only six defense witnesses was used to demonstrate that Burger King had misclassified 246 assistant managers in 44 different restaurants. 672 F.2d 221, 224-225 (1st Cir. 1982). The court expressly found representative

evidence was an appropriate method to prove that employees had been misclassified as exempt on a class-wide basis.

Similarly, in *In re Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation*, a nationwide FLSA exemption regarding insurance adjusters, the court determined at trial some adjusters were misclassified as exempt, whereas others were properly classified as exempt. 336 F. Supp.2d 1077, 1082 (D. Or. 2004). What is important, however, is that the court was able to make this determination based on the job classification (i.e., title or position) of the adjusters. Notably, the court was able to try the liability case in less than three weeks *Id.*

And the Fifth Circuit approved of the district court's decision in *Roussell v. Brinker International, Inc.*, of extrapolating the testimony of 14 plaintiffs to the remainder of a 55-person class. 441 Fed.Appx. 222, 227 (5th Cir. 2011).

## CONCLUSION

None of the decertification factors weighs in favor of Nine. It is indisputable that decertification will leave Plaintiffs, Nine, this Court, and potentially other courts, mired in 70 identical trials on the same issues, when one would be enough. Nine's motion for decertification should be denied.